

US BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**



**United States Bankruptcy Judge**

**Signed August 10, 2010**

---

THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HALLWOOD ENERGY, L.P., et al., | § | Case No. 09-31253-11 |
| | § | |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| RAY BALESTRI, TRUSTEE OF THE | § | |
| HALLWOOD ENERGY I CREDITORS' | § | |
| TRUST, as successor-in-interest | § | |
| to HALLWOOD ENERGY, L.P., | § | Adversary No. 09-03082 |
| Plaintiff, | § | |
| | § | |
| and | § | |
| | § | |
| FEI SHALE, L.P., | § | |
| Plaintiff-in-Intervention, | § | |
| | § | |
| and | § | |
| | § | |
| HALL PHOENIX/INWOOD, LTD., | § | |
| Plaintiff-in-Intervention, | § | |
| | § | |
| v. | § | |
| | § | |

MEMORANDUM OPINION AND ORDER                                    PAGE 1

THE HALLWOOD GROUP INCORPORATED,§
    Defendant.          §

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS, AFTER COURT'S *IN CAMERA* INSPECTION OF PRIVILEGE LOG AND WITHHELD DOCUMENTS [DOC. NO. 243]

Before this court is a discovery dispute initiated by Defendant's Motion to Compel Production of Documents and *In Camera* Inspection of Plaintiff-in-Intervention FEI Shale L.P.'s Privilege Log and Brief in Support [Doc. No. 243] (the "Motion"). The Motion was partially resolved prior to the hearing on this matter, through negotiations among the parties. As of the time of the hearing on the Motion, defendant, the Hallwood Group Incorporated (the "Defendant"), was merely requesting that the court review *in camera* 100-plus pages of documents (the "Documents"), listed on a privilege log produced by plaintiff-in-intervention FEI Shale L.P. ("FEI"), and determine: (a) whether the Documents are subject to the attorney-client privilege (the Defendant was concerned that some of the Documents might be more in the nature of business documents that were sent to FEI's attorney in order to manufacture the attorney-client privilege); and (b) to the extent that the Documents are, indeed, subject to the attorney-client privilege, whether the privilege should be deemed **waived** pursuant to the so-called "offensive use doctrine" (sometimes referred to as the "sword-shield doctrine").

For the reasons set forth below, the court rules that all of

the Documents are subject to attorney-client privilege and such privilege has **not** been waived pursuant to the "offensive use doctrine."  Thus, the Motion is denied.

## I.   BACKGROUND FACTS.

The Adversary Proceeding (herein so called) in which this discovery dispute arises was filed in connection with the Chapter 11 bankruptcy case of Hallwood Energy, L.P. (hereinafter, the "Debtor").  There are three plaintiffs in the Adversary Proceeding: (1) Ray Balestri, the Trustee of the Hallwood Energy I Creditors' Trust (a post-confirmation litigation trust that was created pursuant to a confirmed Chapter 11 plan); (2) Hall Phoenix/Inwood Ltd. ("HPI"), the former secured creditor of the Debtor;[1] and (3) FEI, which was party to a significant Acquisition and Farmout Agreement (the "Farmout Agreement") with the Debtor, pursuant to which FEI funded approximately $105 million to the Debtor.  The sole remaining Defendant[2] in the Adversary Proceeding is the former parent (*i.e.,* the former controlling equity holder) of the Debtor, a publicly traded company that is not itself in bankruptcy.

The gist of the Adversary Proceeding is that the Defendant

---

[1] HPI extended well over $100 million of credit to the former Debtor.

[2] At one time, there were several affiliates of the Defendant who were also named as defendants in this lawsuit.  The other defendants have since been dismissed.

breached a prepetition "Equity Support Agreement," dated June 9, 2008, between the Debtor and the Defendant, by not providing at least $3.2 million of funding it was allegedly contractually obligated to provide to the Debtor. FEI was explicitly a third-party beneficiary under the Equity Support Agreement. The breach of the Equity Support Agreement allegedly led to a ripple effect of: (a) a loss of $20 million of funding that FEI might have otherwise provided under the Farmout Agreement (*i.e.,* the Defendant's action allegedly tortiously interfered with the Farmout Agreement between the Debtor and FEI); (b) a default under the Debtor's $115 million secured credit facility with HPI; and (c) other losses to the Debtor and its creditors. The Trustee has alleged breach of contract, torts, and turnover (of the $3.2 million) pursuant to Section 542 of the Bankruptcy Code.

FEI, as intervenor-plaintiff, has separately brought claims in the Adversary Proceeding for not only breach of contract (*i.e.,* breach of the Equity Support Agreement—again, of which FEI was a third-party beneficiary), but also various state-law torts. As earlier mentioned, FEI was party to a Farmout Agreement with Debtor, entered into contemporaneously with the Equity Support Agreement (June 9, 2008), through which it was contemplated that FEI would provide up to $125 million of funding over time and a $10 million consulting fee to the Debtor and, in exchange, FEI would receive a 33% interest in the Debtor's oil and gas assets.

It was also contemplated that the Defendant would provide $12.5 million of capital to the Debtor pursuant to the Equity Support Agreement.  FEI argues that the Equity Support Agreement was entered into at the special insistence and request of FEI, for purposes of providing FEI assurances that the Debtor would remain financially able to meet its responsibilities under the Farmout Agreement.  FEI alleges that it would not have entered into the Farmout Agreement without the Equity Support Agreement.  The Defendant agreed at Section 3.8 of the Equity Support Agreement that, without the prior consent of FEI, the parties would not amend or terminate the Equity Support Agreement.  Also, significantly, the Equity Support Agreement prevented the Defendant from declaring or paying any dividends, and required the Defendant to pay all amounts contemplated under the Equity Support Agreement if and when it ever did.  The Defendant, in fact, declared and paid a dividend in December 2008, at a time when not only had it not fully funded its obligations under the Equity Support Agreement, but also when FEI was still funding under the Farmout Agreement and when the Debtor was drifting into dire financial straits.

FEI, again, has alleged various state law torts against the Defendant in this Adversary Proceeding, including the tort of "Fraud by Non-Disclosure."  The argument made with regard to this tort is that, starting at least around October 21, 2008 and

continuing into January 2009, the Defendant considered the Farmout Agreement and the Equity Support Agreement to be **terminated** (because of the Debtor's inability to continue to pay debts as they became due, if not for other reasons), but the Defendant nonetheless failed to disclose to FEI its position concerning termination and had a duty to disclose this,[3] before FEI funded another $15 million under the Farmout Agreement.

Relatedly, the Trustee in his tortious interference with contract claim, argues that, but for the Defendant's nonfunding of the $3.2 million required by the Equity Support Agreement, FEI would have funded some $20 million in third-tier funding that it decided not to fund under the Farmout Agreement in early 2009. The Defendant maintains that FEI would not have funded this $20 million regardless.[4]

## II. DEFENDANT'S ARGUMENTS REGARDING THE "OFFENSIVE USE DOCTRINE."

As addressed above, the Defendant in its Motion seeks to have the court review *in camera* certain Documents withheld by FEI to see if they are, indeed, subject to the attorney-client privilege or, rather, if they are in the nature of business documents that were simply "run through an attorney" to

---

[3] There are emails that have already been produced that allegedly prove this.

[4] The Defendant argues that there may be evidence of communications with FEI's counsel that will prove this fact.

manufacture privilege. But, even if the Documents are subject to the attorney-client privilege, the Defendant argues that FEI has waived the privilege, through the so-called "offensive use doctrine." Specifically, FEI is seeking affirmative relief in the form of a **fraud by non-disclosure claim** against the Defendant, in which FEI argues that the Defendant defrauded FEI, by not disclosing that it considered the Farmout Agreement and the Equity Support Agreement to be terminated, as early as October 21, 2008, because of the Debtor's inability to pay its debts as they became due. At the same time the Defendant was of this view that the agreements were terminated, Defendant was participating in discussions with FEI and **soliciting additional monies** from FEI under the Farmout Agreement. The fact of termination would mean that the Defendant was relieved of its obligation to pay the approximately $3.2 million to the Debtor under the Equity Support Agreement. FEI argues that, **had it known about the Defendant's position as to termination**, it would have terminated the Farmout Agreement before making $15 million of additional "third tier" funding under it in early 2009, and it would have demanded the return of amounts it previously had funded ("second-tier" funding) that were in the Debtor's "project account" set up under the Farmout Agreement. In other words, FEI essentially argues that its second and third tier funding under the Farmout Agreement were contingent on the Defendant funding

the entire amounts owed under the Equity Support Agreement. FEI asserts that it did not discover this (*i.e.,* the Defendant's position as to termination) and could not have discovered this during the relevant time period. In other words, FEI was completely ignorant of the fact that the Defendant was taking this position. FEI allegedly relied on these non-disclosures of the Defendant and made contributions and approved expenditures from the project account under the Farmout Agreement. FEI argues it was damaged in an amount in excess of $38 million.

The Defendant argues that FEI did not **rely or detrimentally rely** on the Defendant's alleged non-disclosure of its position as to termination. The Defendant argues that the Documents on which FEI asserts attorney-client privilege may reveal that **FEI knew more than it is alleging and had notice of the legal theories as to termination**. According to the Defendant, FEI allegedly had reason to know that the Debtor was insolvent (and that the Defendant could assert the theory/position that Defendant was not obligated to fund under the Equity Support Agreement); however, FEI funded under the Farmout Agreement anyway. The Defendant believes that the Documents may show that FEI was not relying on the Defendant's obligation to fund. The Defendant argues that FEI may be using attorney-client privilege to cloak documents that would otherwise show its decision-making and/or knowledge with respect to funding under the Farmout Agreement, the Equity

Support Agreement, and the Debtor's financial status and
bankruptcy.

## III. THE LAW ON "OFFENSIVE USE WAIVER DOCTRINE" AND THE ATTORNEY-CLIENT PRIVILEGE.

Preliminarily, under Texas law, the elements of attorney-
client privilege are: (a) a confidential communication; (b) made
for the purpose of facilitating the rendition of professional
legal services; (c) between or among the client, lawyer and their
representatives; and (d) the privilege has not been waived.  Tex.
R. Evid. 503(b); *Huie v. DeShazo,* 922 S.W.2d 920, 923 (Tex.
1996); *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467,
473 (N.D. Tex. 2004).  *See also* Fed. R. Ev. 501 ([I]n civil
actions and proceedings, with respect to an element of a claim or
defense as to which State law supplies the rule of decision, the
privilege . . . shall be determined in accordance with State
law."  The burden is on the party asserting the privilege to
demonstrate how a document satisfies these elements.  *Navigant*,
220 F.R.D. at 473.  The attorney-client privilege serves to
"encourage full and frank communications between attorneys and
their clients" for the broader public interest of promoting the
administration of justice (the rationale being that the attorney
needs to know all that relates to the client's situation that
requires legal help).  *Upjohn Co. v. U.S.*, 449 U.S. 383, 389
(1981).  But the privilege extends only to communications made
for the purpose of seeking/providing legal counsel.  "Where an

attorney is serving in some other capacity—such as an accountant, investigator, or business advisor—there is no privilege." *Navigant,* 220 F.R.D. at 474. *See also Huie,* 922 S.W.2d at 927. Moreover, a client can also waive the attorney-client privilege, as to communications that were, in fact, made for the purposes of seeking/providing legal advice, under the so-called "offensive use doctrine." The party asserting the privilege also has the burden of proving there was no waiver of the privilege. *In re Nance*, 143 S.W.3d 506, 510 (Tex. App.-Austin 2004, no pet.).

The case of *Republic Ins. Co. v. Davis*, 856 S.W.2d 158 (Tex. 1993), is the quintessential Texas case dealing with the "offensive use doctrine" in the context of attorney-client privilege. The court indicated in *Republic* that a waiver of the attorney-client privilege may be applicable when the privilege is being used as a sword rather than a shield. *Id.* at 163. *See also Ginsburg v. Fifth Court of Appeals*, 686 S.W.2d 105, 108 (Tex. 1985) (a plaintiff "cannot use one hand to seek affirmative relief in court and with the other lower an iron curtain of silence against otherwise pertinent and proper questions which may have a bearing on his right to maintain his action"). The elements that must exist before a waiver of attorney-client privilege pursuant to this "offensive use doctrine" may be found are: (1) the party asserting the privilege must be seeking affirmative relief; (2) the privileged information sought must be

such that, if believed by fact finder, it would probably be outcome determinative of the cause of action asserted (mere relevance is insufficient; the confidential communications must go to the very heart of the affirmative relief sought; **essentially, the party asserting the privilege must put the protected information at issue)**; and (3) disclosure of confidential communications must be the **only means** by which the aggrieved party may obtain evidence. *Republic*, 856 S.W.2d at 163.

In *Republic*, the plaintiff, Republic Insurance Company ("Republic"), was a reinsurer on certain insurance policies issued by National County Mutual Fire Insurance Company ("National"). *Id.* at 159. One such insurance policy was issued to Culver Concrete. *Id.* An employee of Culver Concrete was later in a car accident that killed another individual. *Id.* The deceased's representatives and survivors ("Claimants") ultimately obtained a judgment against Culver Concrete and the employee, and then made a demand against Republic for the reinsurance proceeds. *Id.* Republic filed a declaratory judgment action acknowledging it owed the reinsurance proceeds; however it was faced with competing demands since National had been put into a receivership and, in that receivership proceeding, there had been an injunction entered prohibiting anyone with assets of National from disposing of those assets (and the reinsurance contract was

an asset of National).  *Id.*  Thus, Republic wanted a court to tell Republic what to do; Republic took the position that its sole obligation was to the receiver of National and not to the Claimants.  *Id.*  The Claimants counterclaimed against Republic based on various theories including the Deceptive Trade Practices Act, the Insurance Code, and common law.  *Id.*  Eventually, certain discovery was sought from Republic, and Republic asserted that certain documents were protected by attorney-client privilege.  *Id.* at 160.  The Texas Supreme Court, in a detailed opinion, found that the "offensive use doctrine" that it had applied with regard to waiver of the doctor-patient privilege in the case of *Ginsburg* (cited above) was also available in connection with the **attorney**-client privilege.  *Id.* at 163.  But here, the Texas Supreme Court held that waiver of the attorney-client privilege could not be found because Republic was not truly seeking affirmative relief by filing a declaratory judgment action.  *Id.* at 164.

In *In re Tjia*, 50 S.W.3d 614 (Tex. App.-Amarillo 2001, no pet.), another case which discusses the applicability of the "offensive-use doctrine," a lessor sued its tenant for breach of contract concerning a commercial lease, seeking unpaid rent as damages.  *Id.* at 616.  The tenant defended the suit and brought a breach of contract/lease counterclaim against the lessor, arguing that the lessor breached the lease by unreasonably withholding

consent to a sublease.  *Id.*  The lessor named its attorney
(Freels) as a fact and expert witness.  *Id.*  The tenant sought
production of documents between the lessor and Freels, and the
lessor claimed they were subject to attorney-client privilege.
*Id.*  The tenant argued that the "offensive use doctrine" applied,
so that the attorney-client privilege was not assertable as to
the documents.  *Id.* at 617.  The lessor argued that it was
asserting its privilege defensively rather than offensively, and
that the information sought was not outcome determinative.  *Id.*
The court disagreed.  *Id.*  The lease provision in question
provided that the lease could be assigned "with the written
consent of LESSOR, which consent will not be unreasonably
withheld."  *Id.*  The lessor argued that they relied solely on
**advice of counsel (Freels)** in not approving the sublease, but
refused to reveal communications between the lessor and Freels.
*Id.* at 618.  The court determined that the "fact that the
information sought is not a part of any element of [lessor's]
claim does not change the fact that, under these circumstances,
the failure of [lessor] to provide their reasons for not
approving the sublease materially affects the ability of [tenant]
to present its defense that consent was unreasonably withheld in
violation of the lease agreement."  *Id.*  The court additionally
reviewed the correspondence *in camera* and determined that, if
certain statements contained therein were "believed by the fact

finder, [they] would in all probability provide a defense to
[lessor's] cause of action."  *Id.*

Similarly, in *DeWitt & Rearick, Inc. v. Ferguson*, 699 S.W.2d
692, 693-94 (Tex. App.-El Paso 1985, no writ.), *disapproved on
other grounds Owens-Corning Fiberglass Corp. v. Caldwell*, 818
S.W.2d 749, 750 (Tex. 1991), certain plaintiffs who testified
that they entered into a settlement (which settlement was now the
subject of a lawsuit) upon advice of counsel, but refused to
reveal the "basis and theories upon which that settlement was
made," asserting attorney-client privilege, were found to have
waived the attorney-client privilege pursuant to the offensive
use doctrine.  In *DeWitt*, the court found that the non-disclosure
of the reasons behind the settlement materially affected the
ability of the defendants to present a defense to the plaintiffs'
cause of action.  *DeWitt*, 699 S.W.2d. at 694.

**IV.  A PROBE INTO THE DOCUMENTS ON FEI'S PRIVILEGE LOG.**

As set forth above, FEI has the burden in this discovery
dispute to establish that the Documents are privileged and also
that there has not been a wavier.  To meet that burden, FEI has
produced a sworn declaration of Roni Haugen in support of FEI's
response to the Motion.  Roni Haugen is an attorney in the in-
house legal department at Talisman Energy Inc. (which has a
services agreement with FEI and provides, among other things,
legal services to FEI).  Ms. Haugen's declaration: (a) lists the

attorneys who have been involved with regard to the Farmout Agreement, the Debtor, and related issues (*i.e.,* both in-house attorneys and outside attorneys at the Akin Gump law firm); and (b) swears that all communications on the privilege log (which she has submitted) dealt with subject matter that called for an attorney's consideration and legal advice, were made for the purpose of facilitating the rendition of legal advice, or summarized legal advice. Ms. Haugen's declaration adds that, despite the suggestions of the Defendant in its Motion, none of these communications reveal that FEI received notice of the Defendant's legal theories or position about the termination of the Farmout Agreement or Equity Support Agreement. FEI has also submitted the actual Documents *in camera*. The court has reviewed the Documents.

First, as a preliminary matter, the court has determined that all of the Documents, indeed, dealt with subject matter that called for an attorney's consideration and legal advice, were made for the purpose of facilitating the rendition of legal advice, or summarized legal advice. Thus, the court is satisfied, preliminarily, that FEI has not cloaked business documents by copying attorneys on such documents.

Next, probing deeper into the Documents, they are separated by 45 different tabs (consisting of over 100 pages of material). ***Only one of the 45 tabbed Documents mentions the Equity Support***

***Agreement explicitly (Document #29).*** Such Document is dated February 4-5, 2009, and indicates that FEI had just learned about the Defendant having declared a dividend in December 2008, and was concerned about a breach of the Equity Support Agreement. Three other Documents out of the 45 (Documents ## 32, 34, and 45) allude to the dividend and/or the commitments of the Defendant under the Equity Support Agreement to fund the full amounts thereunder, but none of these three Documents explicitly or materially discuss the Equity Support Agreement. The Documents, overall, can generally be described as: (a) communications involving analysis of the terms of the Farmout Agreement and expressing concerns about the Debtor's actions with respect to the project account (a bank account set up pursuant to the Farmout Agreement); (b) communications regarding the Debtor having approached FEI regarding a possible acquisition of the Debtor by FEI; (c) communications expressing concerns about the Debtor's financial situation and analyzing FEI's continuing commitments under the Farmout Agreement; and (d) memoranda from the Akin Gump law firm to FEI, explaining American bankruptcy law—sometimes differentiating it from the Canadian law with which FEI was more familiar-and, notably, while the memoranda explained such things as the automatic stay, executory contracts, and the possible bankruptcy-impact on the Farmout Agreement and operating agreements, ***none of the memoranda addressed the Equity Support***

*Agreement*.

**A. Applying the *Republic* Elements.**

Having determined that the Documents are subject to attorney-client privilege, the court next turns to the prospect of waiver. Again, the three elements identified in *Republic* as triggering a waiver of the attorney-client privilege under the "offensive use doctrine" are: (1) the party asserting the privilege must be seeking ***affirmative relief***; (2) the privileged information sought must be such that, if believed by fact finder, it would probably be ***outcome determinative*** of the cause of action being asserted (mere relevance is insufficient; the confidential communications must go to the very heart of the affirmative relief sought; ***essentially, the party asserting the privilege must put the protected information at issue)***; and (3) disclosure of the confidential communications must be the ***only means*** by which the aggrieved party may obtain evidence.

In this Adversary Proceeding, obviously the first element set forth above is met. FEI, the party asserting the privilege, is seeking affirmative relief. But the tougher question/element is whether any of the Documents are "outcome determinative" or go to the very heart of affirmative relief FEI has sought. While FEI has asserted several claims, the one that the Defendant has highlighted in the Motion is FEI's ***fraud by non-disclosure claim***, in which FEI argues that the Defendant defrauded FEI by

concealing that it considered the Farmout Agreement and the Equity Support Agreement to be **terminated** as early as October 21, 2008, because of the Debtor's inability to pay its debts as they became due. FEI argues, that **had it known about this theory/position of the Defendant**, it would have terminated the Farmout Agreement before making additional funding under the Farmout Agreement. As mentioned earlier, the Defendant argues that the documents on which FEI asserts attorney-client privilege may reveal that **FEI knew more than it is alleging and had notice of the legal theories regarding termination**.

The elements of fraud by non-disclosure are: (1) a defendant failed to disclose material facts to a plaintiff; (2) the defendant knew the plaintiff was ignorant of those facts; (3) the defendant intends to induce the other party to take some action by concealing or failing to disclose the facts; (4) the plaintiff justifiably relied on the defendant's non-disclosure; and (5) the plaintiff suffered damages as a result of acting without knowledge of the undisclosed facts. *See Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001). *See also Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 181-82 (Tex. 1997). This court is extremely troubled by any suggestion that, any time a plaintiff who brings a fraud claim, of which reasonable reliance is an element, and such plaintiff was represented by an attorney at the time of the alleged fraud, the plaintiff's communications

with his attorney are vulnerable to being exposed in order to substantiate that the plaintiff was not warned—so to speak—by his lawyer. This seems to be what the Defendant is arguing. In other words, *any reliance by FEI on the Defendant's actions, inactions, or silence cannot possibly have been reasonable (because surely FEI's attorneys were advising it in this regard), and FEI must open up its confidential attorney's files and let the Defendant see if it is correct*.

Here, it seems that it is the *Defendant*, rather than FEI (or Trustee Ballestri or HPI, for that matter—see discussion below) that is putting the Documents—*i.e.*, the protected attorney-client information—at issue. While it is true that *FEI* has sought affirmative relief in the form of a fraud by non-disclosure claim, and it is true that *reasonable or justifiable reliance* as to the non-disclosed information is an element of the fraud claim, it is the Defendant that has put at issue the privileged information, by suggesting that any reliance was not genuine, reasonable, or justifiable, since FEI had a sophisticated lawyer at the time FEI was dealing with the Defendant (and, thus, FEI would/should have been relying on its counsel's advice more than anything the Defendant said or did or did not say). FEI is certainly not putting its counsel's advice at issue—the Defendant is. This seems exactly the opposite of some of the cases the Defendant relies on where relying on "advice of counsel" was

raised by the party asserting the privilege. *See Tjia,* 50 S.W.3d at 617 & *DeWitt*, 699 S.W.2d at 694. Nevertheless, the court will deny the Defendant's Motion here for the more basic reason that it does not believe that any of the Documents are ***outcome determinative***. As mentioned above, scarcely any of the Documents even mention the Equity Support Agreement. Certainly, none of them interpret it. The very few that mention it merely raise concerns about why the Defendant declared a dividend and, essentially, "how can it do that" if it still owes funds under the Equity Support Agreement.

While it is true that certain of the Documents reflect that FEI knew that the Debtor was in financial straits (and such documents contain a discussion of such things as "what may happened to the Farmout Agreement, if the Debtor files bankruptcy"), ***none*** of the Documents provide information that would be ***outcome determinative*** and, perhaps, more importantly, the court believes that the Defendant can get the information contained in them ***through other means***. Specifically, the Defendant can take depositions of FEI representatives and ask if they were aware of the Debtor's financial problems, and how early. But there is nothing in the Documents that is in the nature of a "smoking gun" or anything close—as far as suggesting that FEI knew more than it is alleging and had notice of the Defendant's position/theories regarding termination.

V.   **APPLYING THE "OFFENSIVE USE DOCTRINE" TO THE TRUSTEE'S CLAIMS.**

Finally, the Defendant has made a novel argument that **the Trustee** has asserted claims that trigger the waiver of **FEI's** attorney-client privilege under the "offensive use doctrine."

Recall that the Trustee, in his tortious interference with contract claim, argues that but for the Defendant's non-funding of the $3.2 million required by the Equity Support Agreement, FEI would have funded some $20 million in third-tier funding under the Farmout Agreement that it ultimately decided not to fund in early 2009.  The Defendant maintains that FEI would not have funded regardless, and alleges that there are communications with FEI's counsel that may show this.

Returning once again to the elements articulated by *Republic*, which are that (1) the party asserting the privilege must be seeking **affirmative relief**; (2) the privileged information sought must be such that, if believed by fact finder, it would probably be **outcome determinative** of the cause of action being asserted; and (3) disclosure of the confidential communications must be the **only means** by which the aggrieved party may obtain evidence, the court finds that the first element is not met.  In other words *vis-a-vis* the **Trustee's claims**, the party asserting the privilege (FEI) is not also the one seeking affirmative relief.  However, even if it is somehow proper to

meld the affirmative claims of the Trustee and FEI, this court reiterates that there are no "smoking guns" in the Documents. The Documents do not reveal that FEI would not have funded regardless of the Defendant's failure to fund the $3.2 million. Rather, they show that FEI was definitely concerned about the Debtor and its obligations under the Farmout Agreement and was exploring all of its rights and duties thereunder. But the Documents are not "outcome determinative." Moreover, once again, the court is not convinced that the Documents would be the Defendant's only means to get information regarding whether FEI would or would not have funded, had it known about the Defendant's position/theory regarding the possible termination of the Equity Support Agreement. The Defendant, once again, can depose FEI's business people on this point.

Based on the foregoing, the remaining relief sought in the Motion is denied. FEI need not produce to the Defendant any of the Documents.

It is so **ORDERED**.

### END OF ORDER ###